UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| United States of America, Plaintiff, | ) | |
| vs. | ) | Case No. 07cr40030-FDS-1 |
| Ricardo Rodriguez, Defendant. | ) | |

BEFORE: The Honorable F. Dennis Saylor, IV

Sentencing

United States District Court
Courtroom No. 2
595 Main Street
Worcester, Massachusetts
March 20, 2009

Marianne Kusa-Ryll, RDR, CRR
Official Court Reporter
United States District Court
595 Main Street, Room 514A
Worcester, MA 01608-2093
508-929-3399
Mechanical Steno - Transcript by Computer

APPEARANCES:

United States Attorney's Office
Paul G. Casey, Assistant United States Attorney
Donohue Federal Building and Courthouse
595 Main Street, Suite 206
Worcester, Massachusetts 01608
for the Plaintiff.

Raymond E. Gillespie, Esquire
875 Massachusetts Avenue, Suite 32
Cambridge, Massachusetts 02139
for the Defendant.

INDEX

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Beth Streeter | | | | |
| by Mr. Gillespie | 19 | | | |
| by Mr. Casey | | 25 | | |

EXHIBITS

| No. | Description | For Id. |
|---|---|---|
| A | Waiver of counsel, signed by Ricardo Rodriguez, dated July 22, 2002. | 13 |

P R O C E E D I N G S

THE CLERK: All rise.

Court is now open. You may be seated.

Case No. 07-40030, United States versus Ricardo Rodriguez.

Counsel, please note your appearance for the record.

MR. CASEY: Good afternoon, your Honor. Paul Casey for the United States.

THE COURT: Good afternoon.

MR. GILLESPIE: Good afternoon, your Honor. Raymond Gillespie for the defendant, Ricardo Rodriguez.

THE COURT: All right. Good afternoon.

All right. This is the sentencing of Ricardo Rodriguez.

Excuse me. I have received and read the presentence report, as revised through March 17th, and I've received a number of materials submitted by the defendant: a sentencing memorandum submitted today with attachments; a package of materials submitted some time ago that included an affidavit of the defendant; a neuropsychological report; various materials from, I think, the Fitchburg Public Schools, various assessments of one kind or another; a memorandum from Mr. Cox, who I understand is a reading instructor or writing instructor at Wyatt; various letters of support; a memorandum from

probation, detailing the information supplied from the defendant's mother; and a transcript of a DVD, from the undercover operation.

And also the government has submitted an affidavit from David Patterson of the Mass. State Police, and a lab report. I think that's the whole universe of information I've read; and to my knowledge, no other materials have been submitted to the Court, and nothing was withheld under Rule 32(d)(3).

Is there anything else I should have seen that I have not?

Mr. Casey?

MR. CASEY: Not that I'm aware of, your Honor.

THE COURT: Mr. Gillespie?

MR. GILLESPIE: Not that I'm aware of, Judge.

THE COURT: All right. Mr. Gillespie, I know you've read the presentence report.

Have you had a chance to review it with the defendant?

MR. GILLESPIE: Yes, I have, your Honor.

THE COURT: All right. We have set aside time for a hearing today to address certain factual disputes. My understanding is that at least -- well, the PSR, in any event, now does not add any guideline enhancements due to the presence of crack cocaine. I don't know if that obviates some of the need for the hearing or not.

But, Mr. Gillespie, what do you intend to do today?

MR. GILLESPIE: Well, to a certain extent, it certainly does. As I advised your clerk prehearing, your Honor, based on the developments of this week and a lot of consultations with my client, Mr. Rodriguez, we have decided that -- that on a cost-benefit analysis, it would be more in his own interest to forego the evidentiary hearing as to the issue of the July 27 transaction; therefore, he would not seek to give testimony regarding that.

He will rest on his objection to the presentence report, and we certainly recognize that with the introduction of the trooper's affidavit, perhaps that issue is settled. I don't know.

I just want the Court to know that this is a strategic decision, and in consultation with me, and that regardless of what would happen were testimony to be taken, the risk certainly is not in his interests.

THE COURT: All right. Mr. Casey, what's the government's view on this?

MR. CASEY: I only see one dispute before the Court, and that is a challenge to whether or not a prior marijuana conviction should count or not. So, in terms of determining the facts -- and I don't think that's a question that requires testimony -- I think the Court has received information. Certainly probation has received information from the

defendant's mother, and I know the Court has also received a letter from the defendant's either -- either the mother of the defendant's children, or some relationship with the defendant. I think defense counsel anticipated calling her as a witness in this case.

THE COURT: This is Beth Streeter is the name?

MR. GILLESPIE: That's right, Judge.

MR. CASEY: And I think the Court has also received a letter from Ms. Streeter's mother, a Leblanc?

MR. GILLESPIE: Correct.

MR. CASEY: So if these -- if these are witnesses that the defendant now seeks to further call, I'm not sure how that advances the law, since the Court has the information at least in written form.

So, to the extent that we need to determine facts, I don't think there's any testimony about it.

THE COURT: Okay. Before we get to, I guess, family members or friends or whether they're going to testify, my list of disputed issues -- it wasn't clear to me whether they were resolved or not -- were the -- the issue on the crack cocaine, whether he should be accountable for the July 27th firearm transaction as relevant conduct. I don't know if that's still being pressed. There was an objection that the barrel was cut down at the insistence of the undercover on the sawed-off shotgun. I'm not sure that makes a difference under the

guideline analysis, but I -- I --

MR. GILLESPIE: I don't think it does, your Honor, but I thought that was relevant information.

THE COURT: All right. And then this issue of the marijuana conviction and whether it counts.

Well, let me ask Mr. Gillespie, do you intend to put on any live testimony on any subject at all?

MR. GILLESPIE: Not any factual question, your Honor. I do have basically character witnesses, if the Court would like to hear them.

THE COURT: I -- my response to that is I won't say no, but I also don't want to take up an undue amount of time.

MR. GILLESPIE: Right.

THE COURT: I mean, if the people are here, and they want to be heard, and it's -- I'll -- I'll allow that, but I have read their submissions and -- and have the information in front of me, and I guess I --

MR. GILLESPIE: Well, there's one witness, Mr. Muniz, Mr. Muniz, who has not made a written submission. He's -- he's mentioned in the memorandum, sentencing memorandum as the foreman or supervisor of the defendant at the Porter Contracting job, in the spring of 2007.

THE COURT: Is that the roofing job?

MR. GILLESPIE: The roofing job, yeah, but I do mention I took the liberty of giving the outline of his -- what

he would say basically is that he has known Ricardo for a long time. In fact, he's his cousin, and he noticed a distinct change in him when Beth Streeter became pregnant, and they made plans to have a life together; and one of the things he noticed when he gave him that job was that he was a very hard worker and was really serious about changing. Unfortunately, he still was kind of prone to conflict, and he was limited by his -- what has been termed a learning disability by some people, and by Mr. Cox something else, and one of the results of that was difficulty at the job, which finally resulted in him losing that job. Now that would be his testimony.

THE COURT: Okay. Let's do this. Why don't we work through the guideline issues, get to a guideline calculation without any downward departure or -- or variance or nonguideline sentence, and then if you want to take -- again, I'll let you do it. I just don't want it to be unnecessarily protracted.

MR. GILLESPIE: All right.

THE COURT: We'll see where we are and what you want to do, but let's work through these issues first.

As to the -- well, let me ask the government. On the issue of the shotgun being cut down, is that something the government wishes to press? Again, as a guideline matter, I don't think it makes a difference. It's --

MR. CASEY: I think you can argue whether the

defendant -- I mean, I don't think it's a guideline issue either. So once the Court determines the -- what the guidelines are, and there's arguments about whether there's mitigation or aggravation, I think we can address it at that point.

THE COURT: All right. Let's -- let's handle it that way then. I don't think it affects the guideline calculation.

The crack we've talked about.

Mr. Gillespie, do you wish to be heard on the issue of whether he's accountable for three firearms, as opposed to two?

MR. GILLESPIE: No, your Honor. I'll just rest on the objections in the PSR.

THE COURT: All right. And then why don't we take up the issue of the marijuana conviction. Let me -- I have the defendant's affidavit, if I can find it. I've got it here somewhere.

And what paragraph of the report is the relevant paragraph?

MR. GILLESPIE: Forty-one, I believe.

THE COURT: Forty-one.

All right. Mr. Gillespie, let me hear you on that issue.

MR. GILLESPIE: Well, your Honor, the Court records -- and I apologize. I didn't really notice that there was a question of waiver until fairly recently. The PSR -- the

original PSR had said that this was a counseled conviction, and I guess I accepted that on face value, but as it turns out, there was a waiver, but it's a signed waiver. It's at least, on its face, in accord with court procedure; so, there's not much I'm prepared to say about that right now, but in talking to Mr. Rodriguez about it, it became clear to me that it might not have been truly knowing and voluntary, and, I guess, our only position is that if you choose to basically credit the Court record, as opposed to his affidavit, that you at least take it into consideration in terms of the possible variant sentence, because I think it's -- it's a very reasonable inference that when a person, even in a minor matter, disposes of a criminal case without an attorney, that that automatically raises some red flags as to whether it was truly knowing and voluntary.

THE COURT: Mr. Casey.

MR. CASEY: Your Honor, I think the First Circuit has been clear on this, and I think the leading case is United States versus Barbour, B-A-R-B-O-U-R, 393 F. 3d 82, and that's a 2004 First Circuit case that says that once the establish -- once the existence of the conviction is before the Court, once the -- in other words, once the government, either through the PSR, or in other records, put before the existence of a conviction, the burden shifts to the defendant to show that the prior conviction was either unconst -- was

unconstitutional, either by proving that -- that he was either -- either or both -- if he didn't have counsel that he did not properly waive his counsel; and in this case, I think both the court records -- does the Court have any court records?

THE COURT: I'm not sure I do.

MR. CASEY: I know that probation does have a copy of the docket, and with the Court's permission --

THE COURT: Yes.

MR. CASEY: -- I'd ask the deputy to make it available to the Court.

THE COURT: All right. It's -- and we'll mark this as Exhibit A to this proceeding. It's a criminal docket from what looks like a Fitchburg District Court, and the docket entree says, "Waiver of counsel found after a colloquy," and dated July the 22nd, 2002.

MR. GILLESPIE: I'm sorry. What's the date, your Honor?

THE COURT: I think July the 22nd, 2002.

MR. GILLESPIE: Is that the -- excuse me, your Honor -- tender sheet, your Honor?

THE COURT: It's the docket sheet. It's the -- do you have a copy of it, Mr. Gillespie? It's the -- sort of the normal, in my term, state court docket sheet.

MR. GILLESPIE: Well, your Honor, I have a copy

of -- I requested a full copy. In fact, I have a certified copy from the clerk's office, and I have copy of a tender sheet, which purports to have the waiver on the back, which is signed by the defendant, but not dated and not signed by the judge.

THE COURT: Well, here's what I have.

(Counsel conferred.)

MR. GILLESPIE: Your Honor, I have the full version.

THE COURT: Can we mark that instead then?

MR. GILLESPIE: I'd move to introduce this, Judge.

THE COURT: Why don't we mark that instead as Exhibit A. Let me take a look at it.

Do you have a copy of it that we can have?

MR. GILLESPIE: I think that's my only copy, your Honor, but you can keep it.

THE COURT: Well, I've got a waiver of counsel that's signed. It's dated 7/22/2. It probably should say '02, but I think that's enough to infer that it was July the 22nd, 2002, signed by Ricardo Rodriguez, waiver of counsel, indicating that he was informed of his right to a lawyer, and nonetheless, waives it.

(Waiver was marked Exhibit A for identification.)

MR. GILLESPIE: Your Honor, I don't know if -- there's a document called a tender, a plea or admission. It's a two-sided document, and there's a specific section for

certification by the judge, and it's not signed.

THE COURT: All right. Yes, it's not signed on the front, but on the issue -- or on the back rather, but on the issue of waiver of counsel --

MR. CASEY: Your Honor, if I could just --

THE COURT: Yes.

MR. CASEY: -- read this briefly. The defendant has to show both the claim of lack of representation. He has to establish that he was booked by counsel and that he did not waive his right to counsel.

I think if you take the -- the documents you have, which shows both on the front of the thing that he -- the front of the -- the front of the docket sheet that he waived counsel after the colloquy, his signature under the waiver of rights, and then you have his own affidavit, which I think sinks him in this case --

THE COURT: Yes.

MR. CASEY: -- because he makes the tactical decision to wrap up his case quickly, even though he thinks he may have had a strategic defense on this; but even he says, I agree to waive an attorney, because the prosecutor said it was not a serious case, and I would not -- and I would just be on probation. I could get rid of it that day.

Well, that is a tactical decision to limit one's sentence that he made, and I should also point out beginning

with paragraphs 38, and I believe paragraph 39, he was previously in court on other matters on other days, and did, in fact, have counsel, so he certainly is aware of or was aware of the benefit of counsel in those matters.

So, if you take all of those factors together, and I don't think the defendant needs the burden of establishing this waiver was unknowing or involuntary in any stretch at least on the First Circuit.

THE COURT: All right. For purposes of the sentencing guidelines, I conclude that the conviction set forth at paragraph 41 is sufficient -- sufficiently valid to warrant consideration and enhancements under the guidelines. As the government's pointed out, we have three pieces of evidence indicating that counsel was waived after a colloquy: the face sheet of the criminal docket; the actual waiver document; and the defendant's own affidavit.

Now, in terms of what I do with that information, once we get past the guidelines, I'll tell you I'm of two minds. On the one hand, I recognize it's a conviction of a 17-year-old for marijuana, who didn't have a lawyer. On the other hand, I'm troubled by the notion that these proceedings in the Commonwealth courts are -- you know, should be -- I think I called them like a Las Vegas marriage; that they can be annulled when people don't like them any more, and, you know, they engage in certain tactical decisions, because they get a

good deal, and they're not going to do time, and they want to get rid of it, and then later on seek to have the thing overturned on the ground that it never existed or shouldn't count.

So, I don't have to make that decision now, but, again, for the guideline calculation of criminal history, I do think the conviction ought to count; and based on the three pieces of evidence, meaning Exhibit A in two parts and the defendant's affidavit, I conclude that the defendant, by a preponderance of the evidence, waived his right to counsel after a colloquy with the Court.

MR. GILLESPIE: Your Honor.

THE COURT: Yes.

MR. GILLESPIE: If -- before we move on, might I take a look at Exhibit A again?

THE COURT: Yes.

MR. GILLESPIE: Thank you.

(Pause.)

MR. GILLESPIE: Your Honor, I'm not sure what you were referring to earlier as a separate waiver, signed by the defendant. I do notice a separate waiver in here.

THE COURT: There were two.

MR. GILLESPIE: Two. I see there are two, you're right.

THE COURT: Yeah. And it says 7/22 --

MR. GILLESPIE: And one is --

THE COURT: --/2, which I interpret to be '02.

MR. GILLESPIE: Yeah.

THE COURT: All right. And, again, that ruling is obviously without prejudice to counsel arguing either in -- in favor of a downward departure or a nonguideline sentence.

All right. In terms of the objection concerning the number of firearms, I'm going to overrule it. I do think that the third firearm transaction, that is the one on July 27th, is relevant conduct for purposes of the guidelines, for the reasons set forth on the PSR. I agree with the PSR's analysis, and I make no finding as to the objection concerning the allegation that the defendant cut the barrel down of the shotgun at the assistance of the undercover agent since it's not relevant for the guideline analysis.

All right. Let me then walk through the guideline calculation. Again, it's the starting point. The base offense level is 26. There's a two-level enhancement, because three firearms were involved under 2K2.1(b)(1)(A). Another four levels for trafficking, which brings us to an adjusted offense level of 32, less three levels for acceptance of responsibility on government motion.

MR. CASEY: We would so move, your Honor.

THE COURT: All right. The motion's granted. That brings us to a level 29. His Criminal History Score is 7. His

Criminal History Category is Roman Numeral IV. That produces a guideline range of 121 to 151 months; a supervised release range of two to three years; a fine range of 15,000 to $150,000; and a special assessment of $600 is mandatory.

Is there any objection or correction to that not previously imposed?

Mr. Casey?

MR. CASEY: Not from the government.

THE COURT: Mr. Gillespie?

MR. GILLESPIE: There's no objection to the actual calculation.

THE COURT: All right. And, again, that's the -- the starting point.

All right. Mr. Gillespie, do you wish to put on live evidence, which I think probably now would be the time to do it, if we're going to do it, prior to the argument and allocution?

MR. GILLESPIE: Yes, I'd like to call Beth Streeter, your Honor.

THE COURT: All right.

THE CLERK: Please raise your right hand.

BETH STREETER, SWORN

THE CLERK: Please be seated.

Please state your name and spell your last name for the record.

THE WITNESS: Beth Streeter, S-T-R-E-E-T-E-R.

DIRECT EXAMINATION

BY MR. GILLESPIE:

Q. Now, Beth, how old are you?

A. Twenty years old.

Q. And where do you live? Just give us the street name and the town.

A. The street name is Hemlock Drive in Gardner, Massachusetts.

Q. And how far did you go in school?

A. Ninth grade in high school, and I did obtain my GED.

Q. Okay. And do you have any training besides your GED?

A. Yes. I am a licensed cosmetologist.

Q. Now, you, of course, know Ricardo Rodriguez; is that correct?

A. Yes, I do.

Q. And when did you meet him?

A. I met him in early October of 2006.

Q. Now, did you thereafter begin going out with him?

A. Yes, I did, in November of 2006.

Q. And what were your impressions of -- just briefly your impressions of Mr. Rodriguez at the time?

A. He was a very nice, caring person, somebody that I could see myself with.

Q. Now, you actually found that you were pregnant with

Ricardo's child within two months of meeting him; is that correct?

A. That's correct.

Q. And what was his reaction when you informed him of that?

A. He was happy about it.

Q. What -- what did he indicate to you?

A. Um, he had told me that, you know, he had seen himself, you know, wanting to have children in the future, and that he was definitely ready to have one.

Q. So he didn't indicate any hesitation or fear or reluctance?

A. No, he did not.

Q. Now, thereafter, did the two of you start to plan your life more as a couple than before?

A. Yes, we did. We had talked about getting a place together and just starting a family.

Q. And what did you do?

A. We ended up moving into an apartment together, in December of 2006.

Q. And where was that?

A. That was in Fitchburg, Mass. It was on 98 Laurel Street, in Fitchburg, Mass.

Q. Okay. And how long did you -- how long did you live there?

A. I lived there for -- from December of 2006 until -- until,

I would say, about February 2007.

Q. Were you working at the time?

A. I worked from September of 2006 to -- I would say November -- November of 2007. So, I was working for a period of time.

Q. Was Ricardo working at the time?

A. Yes, he was working at Porter's Roofing.

Q. And prior to that, had he worked someplace else while you were with him?

A. Yes, he had a cooking job. I don't actually recall the names.

Q. Was one at High Gear?

A. Yes, it was.

Q. Okay. Now, how did you get along, and how did he treat you specifically during those first months, say, December through February?

A. He treated me very well. Um, we were -- he was excited about, you know, me carrying his child, and, um, I wouldn't have been with him if I thought, you know, he didn't treat me well, you know.

Q. Did he -- he didn't abuse you?

A. No, he did not.

Q. How was his temper?

A. He never had a temper towards me. I noticed, you know, he had a little bit of a temper towards, you know, once in awhile

with other people, but he never got physical with me or anything like that.

Q. All right. Now, at some point did you move out of the apartment?

A. Yes, I did.

Q. When was that?

A. I had moved out in February of 2007.

Q. And why did you move out?

A. We -- I -- I ended up leaving my job due to my pregnancy, so we were financially unstable, and I ended up, because of that, moving back in with my mother.

Q. So it had nothing to do with the way Ricardo was behaving or treating you?

A. No, it did not.

Q. Do you know if he continued to work thereafter and maintain the apartment?

A. I know that he had worked. I'm not quite sure how long after, but he did maintain the apartment for a few months after I had left.

Q. Now, in spite of the fact that you weren't living together, were you still together as a couple?

A. Yes, we were.

Q. When was your baby born?

A. My baby was born July 25th of 2007.

Q. And that's Ricardo, Jr.; is that correct?

A. He's not a Jr., but his name is Ricardo.

Q. Okay. Ricardo.

And was Ricardo supportive after the birth?

A. Yes, he was.

Q. In what ways?

A. He would help me take care of the baby, feed the baby, change the baby, did everything in his ability to help me with the baby.

Q. Did he give you some money?

A. At one point he had money that he had saved up that he ended up giving to me, because I needed to buy some things for the baby. He did everything that he could.

Q. All right. Now, at some point -- as you know, Ricardo was arrested in December of 2007?

A. Yes.

Q. And you remained in touch with him since that time, correct?

A. Yes, I have.

Q. In fact, you had another child with him, right?

A. Yes, I did.

Q. And that was Romeo?

A. Correct.

Q. And when was that?

A. He was born July 27th of 2008.

Q. And has Ricardo seen Romeo?

A. He has seen him, yes.
Q. While he has been incarcerated?
A. Yes.
Q. How are you supporting yourself at the present time?
A. Currently, I'm on welfare and living in low-income housing, and I'm not working at the time.
Q. And do you get a little help from your mother, Lori LeBlanc?
A. Not financially, but as far as helping me with my children, yes, I do.
Q. Would it help you to have Ricardo around?
A. Oh, definitely it would, yes.
Q. The boys are not of an age yet where they know much about their father, are they?
A. No, they don't.
Q. And how about you, do you -- do you need Ricardo around?
A. Yes, I do. It's very difficult being a single parent and having two children to raise by myself, and I strongly believe that they definitely need their father there, as well as I need him, you know, to help us.
Q. How is your emotional state these days in this situation?
A. It's very hard. I've actually been diagnosed with depression from this situation. It's very hard.

MR. GILLESPIE: Thank you. No further questions.

THE COURT: Any cross-examination?

MR. CASEY: Just a couple of questions.

CROSS-EXAMINATION

BY MR. CASEY:

Q. Did the defendant -- do you know where the defendant got his money from when he gave you money?

A. From what I know, he was saving money to possibly get another apartment, because after we had lost the apartment that we had had together, I know that he was putting money aside from when he was working, so ...

Q. He -- he only worked for a few months; is that correct?

A. Yes.

Q. All right. Were you aware of any of his illegal activities, like his gun trafficking, his drug dealing, things like that?

A. He didn't tell me -- I did not know him at the time of this incident.

Q. Yeah.

A. And to my knowledge, I have not known him to be involved in criminal activity or anything like that to my knowledge.

Q. Did you know about his extensive criminal history?

Did he ever talk about that with you?

A. He didn't talk to me about it, no.

Q. Did he talk to you about -- you said he had temper issues with some people?

A. He did, you know, but it wasn't anything significant.

Nothing that scared me, or, you know, it didn't get in the way of our relationship or anything like that.

Q. But he did get arrested while he was with you?

A. Yes.

Q. I'm not talking about this incident, but he got arrested on another incident --

A. Uh-huh.

Q. -- are you aware of that?

A. I actually don't recall when that was. I don't recall it.

Q. Did he ever talk to you about his hostility toward the Fitchburg Police Department or other police agencies?

A. No, he never -- he never talked to me about it or anything.

MR. CASEY: Okay. Thank you. That's all I have.

THE COURT: Anything further, Mr. Gillespie?

MR. GILLESPIE: No, your Honor, I think the papers probably adequately cover the balance of the defendant's position.

THE COURT: Okay. You may step down.

Anything further, Mr. Gillespie?

MR. GILLESPIE: No more witnesses, your Honor.

THE COURT: All right.

All right. Let me hear first from the government as to its recommended sentence, and then I'll hear from the defense; and obviously, you may structure your arguments as you

see fit, whether it's for a guideline, nonguideline departure, or what have you.

Mr. Casey.

MR. CASEY: Your Honor, I think a guideline sentence is appropriate here, and here's why.

We have an active -- a young man, who since at least the age of 17, maybe earlier, has had constant arrests and convictions with the police, starting in June, at least as far back as June of 1999. I think as a young man at age 14, I think he picked up an assault and battery with a dangerous weapon, and he continued to pick up arrests and convictions even after having appeared in court.

One of the things that the guideline does not take into account or doesn't take into account or counts some -- some certain convictions, which I think sometimes are helpful in -- to the Court determining whether the defendant has demonstrated the ability to follow -- to follow the law. For example, he picked up that possession of marijuana, which the Court is familiar with, July of '02. He also quite regularly picked up disorderly conduct in July of '02, and then he had a series of operating motor vehicles on a suspended license. So even after continually being arrested and convicted of those charges, he would then go right back out and violate that law, so, in 2003 -- 2003 and 2004.

And then he starts to get some more serious offenses.

In December of 2004, he picks up convictions for carrying -- assault and battery, carrying a dangerous weapon, a knife involved in -- that's an incident that involved -- the Court may recall that his brother picked up the convictions in connection with that. That was a dispute or as the police were breaking up a -- or asking people to leave from a bar, there was a confrontation, and the defendant, his brother, and other individuals proceeded to get into fights with the police. This defendant was arrested and found in possession of a knife.

And also, the fighting while he was in the police car and other things demonstrated an out-of-control behavior and that kind of a thing.

He picked up disorderly conduct, assault and battery in March of 2005, and again, he was back to -- and while he was involved in this activity, he picked up some more operating motor vehicles with a suspended license in 2005 and 2007.

The defendant claims that, you know, he was urged to cut down the firearm, the sawed-off shotgun, which is two of the -- at least responsible for the charges in this particular case, the June 27th and the July 18th, but I would point the Court to paragraph 10 of the presentence report, where the defendant -- first of all, we're not in a situation where the defendant said anything like I don't know how to do that. You should do that. I'll get you the gun, but you cut it down if you want it cut down or expressing any hesitation.

In fact, he explained that he put some hardware on the cut barrel, because he cut where the barrel would ordinarily be held, and that the new shorter barrel would then, in the government's parlance, be too hot to handle, and so he doesn't just do it once, but he does it on a couple of occasions.

Not only that, the guidelines don't take into account the -- the drug dealing that occurred in July; and I think the Court should -- as the Court looked at Trooper Patterson's affidavit, up until that time, the def -- he -- the -- the trooper was talking on the telephone to -- to the defendant, and the defendant was arranging these deals and setting these deals up. The trooper wouldn't have been in a position to purchase the cocaine the following day, if it wasn't for the defendant who arranged the deal. He said, We have the drugs. You know, we have drugs, and we have a gun. They were selling everything out of that location.

So, when you look at the guidelines under 3553(a), and you look at all of the factors that the Court needs to consider, a guideline sentence here takes into account a very active criminal history. The -- a defendant who demonstrates that he was out of control in terms of his behavior, constant violence. There's evidence of drug trafficking or at least drug -- at least one drug deal. We've got the prior drug conviction, even though it was marijuana; a total disregard for the law.

So, we're protecting the community. I know Fitchburg will be safer the longer this defendant is locked up. It's not as if he showed remorse, showed that he was -- at any point listened to the courts in the multiple prior times in which he appeared in court. So, if you look under the factors of 3553(a), a guideline sentence here will protect the community. It would hold the defendant accountable, provide deterrence, and be an appropriate sentence under the circumstances.

I don't see a circumstance where a nonguideline sentence would be appropriate here for this defendant. He has been nothing but -- just constant criminal activity. It's not as if there was a break at any time.

So, I'd ask the Court to impose the sentence, the guideline sentence. I'd ask the Court to impose a supervised release term of three years, and I defer to the Court on whether a fine is appropriate.

THE COURT: All right. Thank you.

All right. Mr. Gillespie.

MR. GILLESPIE: Your Honor, there's no denying that the defendant -- defendant has a long history of involvement with the law, but I think some perspective is required.

Certainly, that club fight could have escalated into a very, very dangerous and tragic affair, but even from reviewing the information on it in the presentence report, I think it's clear that the defendant was not a major player in that. There

is some indication that he might have been maced before he was struggling with the police officer in that incident.

He has informed me that that, in fact, was the case. But that is not to take away from the seriousness of that incident or the seriousness of the other conviction for resisting arrest, running from the officer, et cetera.

But I think if you see a pattern, as I've mentioned, in the sentencing memorandum of an individual who, yes, is rebellious, and, yes, is lawless, but there needs to be some kind of proportionality here.

I don't know what the assault and battery by means of a dangerous weapon was at the age of 14, but apart from these two -- these firearms, and believe me, the defendant takes this case very seriously and acknowledges that it was very wrong, very dangerous, and created a tremendous risk for the community, and is, I believe, and I reviewed this with him many times, sincerely and profoundly sorry for having done that.

So, it's not that I'm asking you to disregard many years of repeated run-ins with the law, because they are there, but relatively speaking, they are not the actions, and they really mean hardened, terribly dangerous criminal. They simply aren't.

I would ask the Court to take into consideration this man's academic history. I think it's pretty well documented by what I've submitted to the Court; and, again, it is not an

excuse for any of his run-ins with the law, and especially not an excuse for these firearms, no question about it, but I think it does put him in context. It does put his actions in context. I mean it -- it -- I think kind of rounds off the profile for him. It's not just that this is a -- an incorrigible individual, who repeatedly thumbs his nose at authority and gets into trouble for the sheer joy of it. This was a very troubled individual for many years, principally because of possibly a learning disability, possible -- possibly that the wrong kind of tracking and pigeon-holing of his -- his individuality and his conduct.

He spent what, I don't know, 10 years in special education in the Fitchburg Public School System. He came out, and he couldn't read. He couldn't read when he entered -- functionally, he was illiterate when he entered Wyatt Detention Center two years ago, or a year and a half ago. He now reads. He now writes at a reasonably accomplished level, given his background. I think the most important document in everything I've given you is Mr. Cox's letter. I think it shows that there is hope for somebody like Mr. Rodriguez.

He has both worked his tail off since being in Wyatt day after day, week after week, to try to improve himself academically, because he knows, and he wants to be able to take seriously his role as a father for his two young boys and as a

husband for Beth Streeter.

He has accomplished a lot. Mr. Cox shows that with no uncertainty in his very specific praise for Mr. Rodriguez in the way he has handled this. He was told all his life that he had a learning disability and that he basically couldn't improve.

He has improved dramatically, and he has done it because he had the proper mentoring and because he has had the proper attitude; and that is the result of his meeting Beth in 2006, of their having their child and the children together, and of his sincerely wanting to change his life.

He acknowledges that he deserves a serious sentence in this case. We have asked for four years, your Honor. I realize that is considerably below the guidelines, but I suggest that it is still a lengthy sentence. He has done 15 months to date. So he would basically be doing another 30 months or so, a little more than 30 months. I'd suggest that that's a long enough time for him to reflect, continue to reflect on what he has done, to suffer punishment for what he has done, and the sheer -- the sheer fact that he will be away from his children for another 33 months or so, I think, is -- is ample punishment.

I think this Court can confidently feel, based on the evidence of his changed behavior and attitude, from the date of these offenses that when he gets out, he will not recidivate.

I'd ask the Court to take into consideration the impact his absence will have on his young children and on his fiance.

This is a woman, who is now on 100 percent public assistance. It's terrible that that should have to be. Mr. Rodriguez wants to get out and correct that as soon as possible. I ask you to help him do that. I ask you to give him a sentence of four years as a variant from the guidelines.

Thank you, your Honor.

THE COURT: Okay. Mr. Casey, any response?

MR. CASEY: Just very briefly, your Honor. If the Court looks at the defendant's employment history, it's not as if this defendant was seeking long employment, enough to support the family, the girlfriend. He had very short employment from a cousin for about four or five months. Prior to that he had a very brief tenure with another company. This is a defendant that didn't work.

So, to suggest that he -- somehow you're taking away his livelihood, and sadly, while he now has two young children, I wonder if they're not in a better position as we currently sit, given this defendant's long criminal history, and the type of behavior he has demonstrated, both a lack of respect to authority, to others throughout his life, to show that this would somehow inure to the benefit of the children to have this defendant around. I actually think the opposite is -- is a better situation for the children.

THE COURT: Okay. Mr. Rodriguez, do you wish to address the Court before I impose sentence?

THE DEFENDANT: I do. I'd like to say -- first of all, I'd like to apologize to the community, because I realize that what I've done could affect them. I'd like to tell the Court sorry for being here and wasting you guys' time. And sorry to my family, which they serve the time with me. To Beth Streeter, I'm sorry for leaving her and my kids out there without me; and my time of being incarcerated, I learned that you have to read. The fact is I don't want to go home and not be able to read to my kids. I want to further my education and do as many jobs as it takes me to do; and if I can't do one because of my education, I'm going to get the next one and continue. That's why I had so many jobs. And when I get out, if it takes 50 jobs in one year so I can support my family, so be it, until I find that one job.

And, you know, I learned a lot, how to read, and I think now I feel better about having jobs, and, you know, I just need a way. You know, I want to be home -- I want to be home and be my kids' daddy, but in a way, I'm happy I'm here, that I got caught, because now I know them guns will be destroyed, and nobody will be hurt because of me, and I truly do -- truly feel it.

And I ask God for forgiveness, and I ask everybody for forgiveness. That's about it.

THE COURT: Okay. Thank you, Mr. Rodriguez.

May I speak to probation.

(The Court conferred with probation.)

THE COURT: All right. Let me -- let me make a few remarks first.

The -- it is certainly true that the defendant has a long history of involvement with the law going back to the age of 14. It's some of those convictions for operating a motor vehicle without a license, but nonetheless, there's, I think, serious cause for concern looking at the number of contacts with law enforcement and what appears to be a -- I think someone used the phrase rebellious and lawless quality to all of it.

He has never really had a job for any serious length of time. The fact that he has fathered children is certainly unfortunate for the children, but also cuts both ways. It's not necessarily particularly the responsible thing under the circumstances either.

I do find it very positive that he has worked on his reading and writing in Wyatt. I was impressed by the memorandum of Mr. Cox. It did jump out at me from the record. It's hard to do that when an adult, and I commend the defendant for his attitude and progress in that respect.

In terms of his criminal history, he does get a point for a marijuana conviction that was CWOF'd; that he didn't have

counsel for, although he waived it, and he was 17 years old when that happened, and that level adds at least a year or so to his guideline sentence.

On the other hand, one gets the feeling, looking at the record as a whole, that the defendant is narrowly skirting even greater criminal enhancements. He is not being credited, if that's the right word, with the crack cocaine in this case. The fact it was a sawed-off shotgun is not being taken into account under the guidelines, and he has a number of brushes with law enforcement that at least, on their face, look like they could have gone either way.

And so, it's difficult -- a difficult judgment whether his criminal history really does overstate -- criminal history category, whether it really does overstate the seriousness of his criminal history, given all of the circumstances.

And last, but not least, the sale of guns is a highly dangerous activity. You know, it's -- it's punished sometimes more lightly than the drug offenses, but really it's highly antisocial, devastating to the City of Fitchburg and the surrounding areas to have these guns out on the street with people openly dealing in them and supplying guns for what is no doubt a variety of lawless activity.

So, to put it altogether, there is not a whole lot to be positive about here. The only arguable ground under the guidelines themselves for any leniency is this Criminal History

Category issue. With significant misgivings, I am going to give him that one-level credit and not downward depart on the grounds that the Criminal History Category does overstate his criminal history, based on that one conviction, and I do that, as I indicate -- as I said, with some misgivings, given the whole constellation of activity here.

And I'm going to sentence him as if he were a level 31 and impose a 108-month sentence. That is a guideline departure sentence. I would impose the same sentence without the guidelines, that is, on a nonguideline basis. It is a nine-year sentence, which is a long term for someone his age, but the activity is dangerous and serious, and I cannot grant any further departure or downward movement other than that.

And I will impose no fine under the financial circumstances, and a three-year term of supervised release.

So, with that, let me formally state the sentence that I'm going to impose. I will follow that with a formal statement of the reasons for the sentence. At which time, I'll give counsel a final opportunity to interpose any corrections or objections before I finally impose the sentence.

Mr. Rodriguez, will you please stand.

Pursuant to the Sentencing Reform Act of 1984 and having considered the sentencing factors set forth at 18 U.S.C., Section 3553(a), it is the judgment of the Court that the defendant Ricardo Rodriguez is hereby committed to the

custody of the Bureau of Prisons, to be imprisoned for a term of 108 months.

This term consists of terms of 108 months on Counts One through Five, to be served concurrently; and 68 months on Count Six -- I'm sorry. Count Six has been dropped, hasn't it? Is that the -- no, I'm sorry.

Yes, Count Six has been dropped. I think that's the felon in possession count; is that right? I think the --

MR. CASEY: Yeah, I wasn't present.

THE COURT: Pardon?

MR. CASEY: I wasn't present, but there's an agreement to drop the count. I didn't --

THE COURT: No. I'm sorry. I'm -- I'm confused here by the -- Count Six is still in. Sixty-eight months on Count Six to be -- also to be served concurrently. Is that right?

PROBATION: I'm sorry, your Honor.

THE COURT: 108 months on One through Five to be served concurrently, and 68 months on Count Six concurrently.

Okay. I'm going to ask probation to double check that. Make sure I have that right.

The Court makes a judicial recommendation that the defendant participate in mental health treatment and anger management, if available, at the designated Bureau of Prisons' facility.

Upon release from imprisonment, the defendant shall be

placed on supervised release for a term of three years. This term consists of terms of three years on each count, all such terms to run concurrently.

Within 72 hours of release from custody of the Bureau of Prisons, the defendant shall report in person to the district to which the defendant is released.

While on supervised release, the defendant shall comply with the following terms and conditions: The defendant shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance.

The defendant shall refrain from any unlawful use of a controlled substance.

The defendant shall submit to one drug test within 15 days of release from imprisonment, and at least two periodic drug tests thereafter, not to exceed 104 tests per year, as directed by the probation office.

The defendant shall submit to the collection of a DNA sample as directed by the probation office.

The defendant shall comply with the standard conditions that have been adopted by the Court, which are set forth in Section 5D1.3(c) of the guidelines, and which will be set forth in detail in the judgment.

The defendant is prohibited from possessing a firearm, destructive device, or other dangerous weapon, and it is further ordered that the defendant shall pay to the United

States a special assessment of $600, which shall be due immediately.

You may be seated.

In terms of the formal reasons for the sentence, again, it is a one-level departure under the guidelines for the reasons I indicated. I have considered the sentencing factors of Section 3553(a), and I have concluded the sentence is no longer than necessary to serve the goals of sentencing; foremost in my mind, being the safety and protection of the community.

A period of three years will be required to help the defendant adjust to a noninstitutional lifestyle and to ensure adequate supervision.

The defendant has established that he is not able, and even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine required under the guidelines.

And in light of the length of the term, the combined sanction is punitive, and no additional sanction is required.

Let me have a quick word with probation.

(The Court conferred with Probation.)

THE COURT: I'm sorry for the confusion. The -- Ms. Foster, who prepared the PSR, isn't here, and we had a little confusion on my end.

Is there any objection or correction to that sentence

not previously interposed?

Mr. Casey?

MR. CASEY: Not from the government, your Honor.

THE COURT: Mr. Gillespie?

MR. GILLESPIE: No objection. I just have a request regarding the special assessment, your Honor.

THE COURT: Yes.

MR. GILLESPIE: It's my understanding -- certainly, he can't pay that now. My understanding is that failure to pay that immediately often prevents participation in some programs in the BOP; so, I would request that you make a recommendation that that be postponed until he's released.

THE COURT: All right.

(The Court conferred with Probation.)

THE COURT: All right. Based on my understanding that that is not true, and the Bureau of Prisons can -- excuse me -- arrange for a payment program or a delayed payment of the amount, I will issue the usual order, which is to be paid immediately.

And if I'm wrong, Mr. Gillespie, you'll have an opportunity for a motion to correct the sentence, if that assumption is wrong.

MR. GILLESPIE: Thank you, your Honor.

THE COURT: I'll give you that opportunity.

All right. Anything further, Mr. Casey?

MR. CASEY: No. Thank you, your Honor.

THE COURT: Anything further, Mr. Gillespie?

MR. GILLESPIE: Oh, I'm sorry. Nothing further, your Honor.

THE COURT: Mr. Rodriguez, I feel compelled to add that Mr. Gillespie has done a terrific job on your behalf. He's worked hard and pulled a lot of information together for you, and you ought to be grateful that he has worked as hard as he can, which really has done you a lot of good, even though it may not feel like it under the circumstances.

All right. Thank you. We'll stand in recess.

(At 3:51 p.m., Court was adjourned.)

C E R T I F I C A T E

I, Marianne Kusa-Ryll, RDR, CRR, Official Court Reporter, do hereby certify that the foregoing transcript, consisting of 43 pages, is a true and accurate transcription of my stenographic notes in Case No. 07cr40030-FDS-1, United States of America versus Ricardo Rodriguez, before F. Dennis Saylor, IV, on March 20, 2009, to the best of my skill, knowledge, and ability.

/s/ Marianne Kusa-Ryll 7/20/2009

Marianne Kusa-Ryll, RDR, CRR

Official Court Reporter